## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ken Davis,

        Plaintiff,

v.

Larson Moving and Storage, Co. d/b/a
Mohawk Moving & Storage

        Defendant.

Civil No. 08-CV-01408

**DEFENDANT'S MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS
AMENDED COMPLAINT OR IN THE
ALTERNATIVE TO STAY AND
REFER TO ARBITRATION**

Defendant Larson Moving and Storage, Co. d/b/a Mohawk Moving & Storage ("Mohawk") submits this memorandum in support of its motion to dismiss Plaintiff Ken Davis's First Amended Complaint, or in the alternative to stay and refer to arbitration.

Mohawk is a trucking company, and Mr. Davis is an independent contractor who owns and operates his own truck. Mr. Davis is suing Mohawk under federal leasing regulations for claims relating to an independent contractor's lease agreement (the "1998 ICLA") and an independent contractor operating agreement (the "2004 ICOA").

The 2004 ICOA includes an arbitration clause covering "All Disputes," including claims under the federal leasing regulations. Mr. Davis's claims regarding the 2004 ICOA must be referred to arbitration, and this part of his suit dismissed without prejudice or stayed.

Mr. Davis's claims relating to the 1998 ICLA, brought under 49 U.S.C. §§ 14704 *et seq.* and 49 C.F.R. Chapter 376, are time-barred by the two-year statute of limitations provided by 49 U.S.C. § 14705(c). These claims should be dismissed with prejudice.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

Mr. Davis is a resident of Ham Lake, Minnesota, and has been the owner and operator of a series of semi-trailer tractor trucks.  *See* Amended Complaint ¶ 1 (Ex. 2)[1]; 1998 ICLA ¶ 1 (Ex. 3) (describing his 1995 International truck); 2004 ICOA ¶ 1 (Ex. 4) (describing his 1999 Freightliner truck).  Mohawk is a moving company based in Blaine, Minnesota.  *See* Amended Complaint ¶ 2.  Mohawk is affiliated with United Van Lines, and is in the "business of transporting and storing household goods and commodities . . . ."  Preamble to 1998 ICLA at 1; Preamble to 2004 ICOA at 1.

### A.         The 1998 ICLA

On May 19, 1998, Mr. Davis and Mohawk entered into the 1998 ICLA.  This detailed lease agreement provided, *inter alia*, that Mr. Davis would provide services, including the use of his semi-trailer tractor truck and his operation of the truck, in moving cargo assigned by Mohawk.  *See* 1998 ICLA ¶¶ 1 & 6.  Mr. Davis also agreed to hire any additional personnel he needed to provide services under the lease, *id.* ¶ 8, and he agreed that any such personnel would be his employees.  *Id.*  Mr. Davis further agreed that neither he, nor anyone he hired, would be employees of Mohawk.  *Id.*; *see also id.* ¶ 30 (agreement that Mr. Davis was an independent contractor).

The 1998 ICLA set forth detailed agreements related to insurance, costs, indemnification, and charge-back agreements.  *See, e.g.*, *id.* ¶¶ 11, 13, & 17.  Mr. Davis's

---

[1]  Citations to exhibits in this memorandum refer to exhibits attached to the Declaration of Andre Hanson, dated June 25, 2008, filed concurrently herewith.

compensation was based on a "contractor's rate schedule," incorporated into the lease agreement.  *See* 1998 ICLA ¶ 27.

The parties operated under the 1998 ICLA for over six years.  They terminated the agreement in favor of a new agreement on September 28, 2004, the 2004 ICOA.

### B.        The 2004 ICOA

Like the 1998 ICLA, the 2004 ICOA describes in detail the mutual obligations between Mr. Davis and Mohawk.  The 2004 ICOA is a thorough statement of the parties' agreement, containing 24 sections and attachments labeled A-I.  Mr. Davis's compensation was controlled by § 6 of the 2004 ICOA, which incorporates the four page "Attachment A, Contractor's Compensation."  This attachment to the lease describes in detail and specificity the manner in which Mr. Davis's compensation was to be calculated, based on the percentage of net distributable linehaul and net distributable revenue.  *See* Attachment A to 2004 ICOA.

The 2004 ICOA similarly sets forth detailed instructions regarding Mr. Davis's responsibilities under the lease.  In addition to providing specifically identified vehicles, 2004 ICOA § 1, Mr. Davis agreed to "furnish all transportation, loading and unloading, packing and unpacking (with [Mohawk] furnishing packing materials when necessary), crating and uncrating, pad-wrapping, decking, strapping, securing, unwrapping, and all other services necessary in connection with all shipments offered by" Mohawk and accepted by Mr. Davis.  *Id.* § 4(a).  The lease provides specific information regarding responsibilities for Mr. Davis's operating expenses, including licenses, permits, and toll charges, 2004 ICOA § 8(a); license plate and SSRS fees, *id.* § 8(e)(1)-(4); and the costs

of fuel and fuel taxes, *id.* § 8(f)(1)-(6).  It similarly provides detailed agreements regarding "Charge-backs and other deductions," 2004 ICOA § 11(a)-(b) & Attachment B, Schedules 1 & 2; insurance, 2004 ICOA § 13 & Attachment C, and an escrow fund, 2004 ICOA § 15 & Attachment D.  The 2004 ICOA could be terminated without cause by either party upon thirty days notice.  *See* 2004 ICOA § 17(b).

The 2004 ICOA contains an express arbitration clause which reaches "All disputes."  *See* 2004 ICOA § 24(a).  Mr. Davis also stipulated that he is not Mohawk's employee, but rather is an independent contractor.  *See* 2004 ICOA § 24(a); *see also id.* § 5.  Section 24 further directs that arbitrations are to be held in Minneapolis, Minnesota, *id*. § 24(c), provides for binding awards, *id*. § 24(d), and provides that each party shall pay its own fees and expenses.  *Id*. § 24(e).  Because Mr. Davis only owned one truck, § 24(e) further provides that he does not have to pay an arbitration filing fee greater than the equivalent fee that would be paid in this Court.  *Id*. § 24(e).

### C.        The Original Complaint

Mr. Davis served his original Complaint ("Original Complaint") on Mohawk on October 16, 2006.  Ex. 1.  The Original Complaint was styled as a Minnesota state court action, venued in Anoka County District Court, in Minnesota's Tenth Judicial District (file number is 02-CV-08-3113).  Following agreement of the parties, Mohawk timely answered the Original Complaint on December 12, 2006.  The parties exchanged some initial discovery, but the action was not filed in Anoka County and largely remained dormant for well over a year.  In April 2008, approximately one and a half years later,

Davis finally filed the matter in Anoka County.  Concurrent with that filing, Mr. Davis substituted his current counsel for his previous attorney.

Mr. Davis's Original Complaint was styled solely as a claim for an alleged breach of the 1998 ICLA.  It did not set forth any claims based on federal law, and it did not base any claims on the 2004 ICOA.  Mr. Davis alleged that Mohawk "withheld money from Plaintiff that was due him for services performed on Defendant's behalf," Original Complaint ¶ 17, but that "despite his knowledge of the pay discrepancy, Plaintiff continued to perform his obligations pursuant to the Agreement" because he "was starting a new family, was scheduled to have back surgery and was not in a financial position to jeopardize losing his contract with Defendant or to hire an attorney to represent his interests." *Id.* ¶¶ 19-20.

Mr. Davis claimed greater than half a million dollars in damages, alleging that "On some occasions, Defendant failed to compensate Plaintiff with the proper percentage rate for a particular service as provided by the Rate Schedule," and "On other occasions, Defendant applied Plaintiff's percentage rate against Defendant's revenue amount, rather than the Invoice amount charged to Defendant's customers." *Id.* ¶¶ 28-29 & 31. Mohawk denied Mr. Davis's allegations of breach and injury.  *See generally* Answer to Original Complaint.

### D.        The Amended Complaint

The parties stipulated that Mr. Davis could file an Amended Complaint, and on May 21, 2008, Mr. Davis's counsel filed in the Anoka County Court, and served on Mohawk, his Amended Complaint.  The Amended Complaint bears no resemblance to

the Original Complaint, beyond its caption.  It does not contain any detailed or factual allegations of breach, but rather focuses on characterizing the federal leasing regulations, and raising conclusory allegations that the 1998 ICLA and the 2004 ICOA violated these provisions.  *See* Amended Complaint ¶¶ 13-38.

The Amended Complaint attaches both the 1998 ICLA and the 2004 ICOA, *see* Amended Complaint ¶¶ 6 & 7 and Exhibits A & B thereto, and seeks relief under both lease agreements.[2]  Claim One of the Amended Complaint is entitled "Statutory Claim for Violations of the Lease and Interchange Regulations Under 49 U.S.C. §14704(a)(1)," and ¶ 14 of the Amended Complaint alleges that:  "In Count One Plaintiff seeks damages caused by Defendant's violations of lease and interchange regulations, 49 C.F.R. §§376.11 and 376.12, and related costs and attorney fees."  Based on this assertion of a federal statutory cause of action, Mohawk removed this case to this Court.  *See* Notice of Removal (Dkt. No. 1).

## II.   MR. DAVIS'S AMENDED COMPLAINT SHOULD BE DISMISSED

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must take as true all facts alleged in the complaint, and must construe the pleadings in the light most favorable to the plaintiff.  *Knieriem v. Group Health Plan, Inc.*, 434 F.3d 1058, 1060 (8th Cir.), *cert. denied*, 548 U.S. 905 (2006).  "A complaint

---

[2] In ruling on this motion to dismiss, the Court may consider and rely upon the 1998 ICLA and 2004 ICOA without converting this motion to one for summary judgment. *See, e.g.*, *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 n.7 (8th Cir. 1997).

must allege facts sufficient to state a claim as a matter of law." *Stringer v. St. James R-1 School Dist.*, 446 F.3d 799, 802 (8th Cir. 2006).

### A.        The 2004 ICOA Mandates Arbitration

The Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.*, "was designed to overcome an anachronistic judicial hostility to agreements to arbitrate, which American courts had borrowed from English common law." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 n.14 (1985).  The FAA "reflects Congress's 'declaration of a liberal federal policy favoring arbitration agreements,' and its intent 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Madol v. Dan Nelson Auto. Group*, 372 F.3d 997, 999 (8th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Section 2 of the FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The FAA allows parties to arbitrable disputes to petition federal courts for an order compelling arbitration.  *See* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [which otherwise would have subject matter

jurisdiction] for an order directing that such arbitration proceed in the manner provided for in such agreement."). Following notice and an opportunity to be heard, "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* In entering such an order the court may enter a stay of judicial proceedings, *see* 9 U.S.C. § 3, or in the exercise of sound discretion dismiss the judicial action without prejudice. *See, e.g.*, *Marlar v. Yellow Transp.*, 2004 U.S. Dist. LEXIS 26653, at *28 (W.D. Mo. Nov. 29, 2004) (Ex. 5) (citing majority rule and holding that "where as here, all of the issues raised are subject to arbitration, there is sufficient case law to support dismissal of this action, and that a dismissal without prejudice is appropriate.").

### 1.        The 2004 ICOA's Arbitration Clause Reaches the Disputes In this Case.

The court's role in determining whether to "compel arbitration is limited. [The court] must determine simply whether the parties have entered a valid agreement to arbitrate and, if so, whether the existing dispute falls under the coverage of the agreement." *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir. 2001). Once the court concludes "that the parties have reached such an agreement, the FAA compels judicial enforcement of the arbitration agreement." *Id.*

Mr. Davis has sued for an alleged breach of the 2004 ICOA, *see* Amended Complaint ¶¶ 39-40, and for alleged violations of the federal leasing regulations related to the 2004 ICOA. *See id.* ¶¶ 13-38. Section 24 of the 2004 ICOA provides an express arbitration clause, and directs:

> 24(a).  <u>Arbitration Required for All Disputes.</u>  Any dispute (including a request for preliminary relief) arising in connection with or relating to this Agreement, its terms, or its implementation, including any allegation of tort or of breach of this Agreement or of violations of the requirements of any applicable government authorities, whether local, state, federal, or foreign, including but not limited to the federal leasing regulations (49 C.F.R. Part 376), shall be fully and finally resolved by arbitration in accordance with (1) the Commercial Arbitration Rules (and related arbitration rules for preliminary relief)( of the American Arbitration Association ("AAA"); (2) the Federal Arbitration Act (ch. 1 of tit. 9 of United States Code, with respect to which the parties agree that this Agreement is not an exempt "contract of employment") or, if the Federal Arbitration Act is held not to apply, the arbitration laws of the State of Missouri; and (3) the procedures set forth below.

This clause reaches all claims related to the 2004 ICOA raised in Mr. Davis's Amended Complaint, and it should be enforced.  *See, e.g.*, *Mitsubishi*, 473 U.S. at 626-27 (the FAA "provides no basis for disfavoring agreements to arbitrate statutory claims").

## 2.      The FAA's "Employee Exception" Does Not Apply.

Section 1 of the FAA, 9 U.S.C. § 1, crafts a narrow exception to the scope of the FAA, and provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  In *Circuit City Stores v. Adams*, 532 U.S. 105 (2001), the Supreme Court held that this does not exempt employment contracts generally from the sweep of the FAA, but "only contracts of employment of transportation workers."  *Id.* at 119.

Mr. Davis is an independent contractor, and not an employee.  In addition to Mr. Davis's agreement in § 24(a) that the 2004 ICOA is not a contract of employment, in § 5 of the 2004 ICOA, Mr. Davis further stipulated that he is not Mohawk's employee:

> 5.      <u>CONTRACTOR NOT EMPLOYEE OF COMPANY</u>.

> CONTRACTOR is an independent contractor with respect to the
> Equipment, transportation, and other services provided pursuant to this
> Agreement. . . .

In *Owner-Operator Independent Drivers Assoc., Inc. (OOIDA) v. Swift Trans. Co.*, 288 F. Supp. 2d 1033 (D. Ariz. 2003), the court rejected the argument that, for purposes of diminishing the expansive scope of arbitrability, the term "employee" should be expanded to encompass independent contractor owner-operator truck drivers. *See id.* at 1035-36. The court noted that the plaintiffs had signed agreements stating that they are *not* employees, and that, "[g]iven the strong and liberal federal policy favoring arbitral dispute resolution, the Court cannot conclude on this record that § 1 bars the enforcement of the arbitration provision at issue." *Id.*

Other courts agree that by its plain language, the "employee" exception does not apply to independent contractors who own and operate their trucks. *See OOIDA v. United Van Lines, LLC*, 2006 U.S. Dist. LEXIS 97022, at *8-10 (W.D. Mo. Nov. 15, 2006) (Ex. 6); *Letourneau v. FedEx Ground Package Sys., Inc.*, 2004 WL 758231, at *1 (D.N.H. Apr. 7, 2004) (Ex. 7); *cf. Roadway Package System, Inc.*, 1999 WL 817724, at *4 n.4 (E.D. Pa. Oct. 13, 1999) (Ex. 8) (noting that the FAA's § 1 exemption was not applicable because the driver was an independent contractor and not an employee), *vacation of arbitration award aff'd*, 257 F.3d 287 (3d Cir. 2001).

**a.        There is no "Statutory Employment" relationship between Mohawk and Mr. Davis.**

The court in *Gagnon v. Service Trucking, Inc.*, 266 F. Supp. 2d 1361 (M.D. Fla. 2003), disagreed with this plain reading. The *Gagnon* court noted that the leasing statutes

and regulations required trucking companies to exercise "direction and control" over the drivers hauling for them. *See id.* at 1365 & n.12 (citing 49 U.S.C. § 14102 and 49 C.F.R. § 376.12(c)(1)). This obligation, according to the *Gagnon* court, created a "statutory employer-employee relationship between" the trucking company and the owner-operator drivers, even though the contract between the parties expressly stipulated that the drivers were independent contractors. *See id.* at 1365. The court thus held that the "employee" exception to § 1 of the FAA would apply. *Id.* at 1365-66; *see also OOIDA v. Landstar System, Inc.*, 2003 WL 23941713, at *2 (M.D. Fla. Sept. 30, 2003) (Ex. 9) (adopting *Gagnon* analysis).

The *Gagnon* decision is, however, directly contrary to the authority upon which it relies. In the same regulation cited by the *Gagnon* court as supporting a statutory employment relationship, the federal leasing regulations expressly provide that they *do not* convert the independent contractor relationship into an employment relationship:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

49 C.F.R. 376.12(c)(4). As admitted by the court in *OOIDA v. C.R. England, Inc.*, 325 F. Supp. 2d 1252, 1258 (D. Utah 2004), "the regulations and case law involving statutory employer-employee are not applicable to the present situation, which does not involve liability for personal injuries."

**b.**         **Mr. Davis is an independent contractor, and not Mohawk's employee.**

Although rejecting *Gagnon*, the court in *C.R. England* also applied the FAA's § 1

employee exception to owner-operator truck drivers.  *See C.R. England, Inc.*, 325 F.

Supp. 2d at 1258.  The court disregarded as "boiler plate" the contractual language stating

that the drivers were independent contractors.  *Id.*  Instead, the court held that the parties

had an employment relationship because their contract covered "the owner-operator's

agreement to perform personally, or through other drivers, certain functions relating to

the operation of the equipment . . . to transport freight on the company's behalf."  *Id.*

The law of this state, and this Circuit, does not support the *C.R. England* approach.

In *Rochester Dairy Co. v. Christgau*, 14 N.W.2d 780 (Minn. 1944), at issue was whether

a milk truck driver who had died and had been an "employee" for the purposes of the

unemployment act.  The driver and the creamery had agreed in their contract that he was

an independent contractor, and the Minnesota Supreme Court enforced this agreement:

> The contract is in writing. . . . The contract is an admirable piece of
> draftsmanship.  It is expressed in clear, simple, definite language, free from
> ambiguity.  There is no excuse for the court to read into it anything that is
> not there. . . . Nor can there be any question that the contract was drawn for
> the express purpose of making the hauler an independent contractor.  This
> was a lawful purpose and such a relation is not against public policy.

*Id.* at 781 (quotations omitted).  Because there was no evidence "to show that the contract

was in any sense fictitious or sham and as it had been voluntarily entered into by the

hauler without persuasion from any source," it was enforceable as written.  *Id.*

In *Tretter v. Dart Transit Co.*, 135 N.W.2d 484 (Minn. 1965), the Minnesota

Supreme Court again examined whether an owner-operator truck driver was an

independent contractor.  The court employed the five factor common law test for

distinguishing between an employee and an independent contractor, examining:

> (1) The right to control the means and manner of performance;

> (2) the mode of payment;

> (3) the furnishing of material or tools;

> (4) the control of the premises where the work is done; and

> (5) the right of the employer to discharge.

*Id.* at 486.  The court held that the truck driver was an independent contractor, and not an

employee, based on a variety of factors.  These included that the owner-operator:

> ¤  [O]wned his own equipment which represented a substantial
> financial outlay; he leased it to the carrier.

> ¤  In the operation of it, he paid for its maintenance including oil and
> gasoline, carried his own collision insurance, and was compensated
> on the basis of a percentage of the tariff rather than on a wage scale.

> ¤  Social security tax was not withheld by the transportation company,
> nor did it withhold income tax.

> ¤  He filed his own tax returns as one engaged in an independent
> business.

> ¤  He was free to reject or accept loads for transportation as he desired.

> ¤  At all times the tractor was under his control.

*Id.* at 486-87.

In *Berger Transfer & Storage v. Central States, Southeast and Southwest Areas

Pension Fund*, 85 F.3d 1374 (8th Cir. 1996), *affirming* 1995 U.S. Dist. LEXIS 21503 (D.

Minn. June 30, 1995) (Ex. 10), the Eighth Circuit affirmed Judge Kyle's determination

that owner-operator truck drivers, operating under an independent contractor agreement,

were indeed independent contractors as a matter of law.  *See id.* at 1381.  As in *Tretter,*

key factors demonstrated that the drivers were independent contractors, including:

> ¤ [T]he owner-operator agreement specifically provided that the owner-operator was responsible for determining the means used to provide transportation services to Berger Transfer.

> ¤ The owner-operators were responsible for hiring and supervising drivers and other workers, loading and unloading the trucks, purchasing and maintaining the leased equipment, paying operating expenses such as fuel and repairs, and paying workers' compensation and withholding employment taxes for drivers. . . .

> ¤ [T]he owner-operators possessed considerable autonomy regarding when and how long they would work. . . .

> ¤ [T]he company paid the owner-operators a percentage of the revenue from each trip, and the owner-operators were not on Berger Transfer's payroll.

*Id.* at 1378-79.

The factors relied upon by the *Tretter* and *Berger Transfer* courts similarly

demonstrate that, as a matter of law, Mr. Davis is an independent contractor.  Mr. Davis

- provided his own tractor truck.  2004 ICOA § 1.

- paid for the maintenance of his truck, including oil and fuel.  2004 ICOA § 8(a).

- carried his own collision insurance.  2004 ICOA § 13 and Attachment C.

- was compensated on the basis of a percentage of the tariff rather than on a wage scale.  2004 ICOA § 6 and Attachment A.

- was responsible for hiring, paying, and supervising any and all personnel he needed to perform his obligations under the contract.  2004 ICOA § 5(a).

- was responsible for payroll taxes.  2004 ICOA § 5(c).

- was free to reject or accept loads for transportation as he desired.  2004 ICOA § 4(a)(1) & (2) (Mr. Davis had the right to reject specific shipments and to be unavailable for reasonable periods).

"In determining whether the status is one of employee or independent contractor, the most important factor considered in light of the nature of the work involved is the right of the employer to control the means and manner of performance." *Tretter*, 135 N.W.2d at 486.  Here, the parties agreed that Mr. Davis had control over the manner and means of performance.  Section 5(c) of the 2004 ICOA is entitled "CONTRACTOR'S Control Over Manner and Means of Performance."  It directs that, subject to legal requirements and Mohawk's customers' needs, Mr. Davis "assumes full control over and responsibility for scheduling work hours and rest periods; selecting routes and fuel stops; deciding when, where, and how maintenance is to be performed on" his truck, and "arranging for packing and unpacking as required, loading and unloading, and other services relating to the goods being transported . . . ."  2004 ICOA § 5(c).  Mr. Davis also agreed that he was solely responsible for "complying with all applicable local, state, federal, or foreign requirements regarding the withholding of income taxes and payroll taxes from wages paid to" Mr. Davis's employees, including "the payment of Social Security and Medicare taxes; and obtaining and maintaining workers' compensation insurance on all of" Mr. Davis's personnel.  *Id.*

c.      **Mr. Davis cannot meet his burden of showing that his claims relating to the 2004 ICOA are not subject to arbitration.**

"A 'party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.'"  *Madol*, 372 F.3d at 999 (quoting *Green Tree Fin. Corp. v Randolph*, 531 U.S. 79, 91 (2000)).  As a "matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the

problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi*, 473 U.S. at 626.  Mr. Davis cannot meet his burden of rebutting the strong presumption of arbitrability.  He expressly agreed that he was an independent contractor, not an employee.  Under the law of this State and this Circuit, he meets the definition of an independent contractor.  Because all disputes under the 2004 ICOA must be brought in arbitration, the Court should either stay this aspect of his suit, or dismiss it without prejudice, in favor of mandatory arbitration.

### 3. The Missouri Uniform Arbitration Act Also Mandates Arbitration.

The 2004 ICOA provides that, if the FAA is held not to apply, then arbitration is mandatory under the arbitration laws of the State of Missouri.  *See* 2004 ICOA § 24. Like the FAA, the Missouri Uniform Arbitration Act ("Missouri UAA") broadly favors written agreements to arbitrate.  *See* Mo. Rev. Stat. § 434.350:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract, except contracts of insurance and contracts of adhesion, to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Unlike the FAA, the Missouri UAA contains no "transportation employee" exemption. *See id.* (exemptions are limited to insurance contracts and contracts of adhesion).

Even if Mr. Davis were exempt under § 1 of the FAA, this exemption would not preempt nor preclude application of the Missouri AAU mandate for arbitration.  *See Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 595-96 (3d Cir. 2004) (arbitration agreement enforceable under Washington state law, holding that "the effect of  Section 1

is merely to leave the arbitrability of disputes in the excluded categories as if the [Federal] Arbitration Act had never been enacted").

Mr. Davis has not sought to revoke the 2004 ICOA, nor is this a contract of insurance.  Mr. Davis has not alleged that the 2004 ICOA is a "contract of adhesion," nor would any such allegation have merit.  The 2004 ICOA has a Minnesota choice of law provision.  *See* 2004 ICOA § 23.  Minnesota courts have defined a contract of adhesion "as one drafted unilaterally by a business and forced upon the public for services that cannot readily be obtained elsewhere."  *Osgood v. Medical, Inc.*, 415 N.W.2d 896, 899 n.1 (Minn. Ct. App. 1987) (citing *Scholobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924 (Minn. 1982)).  "In determining whether an arbitration agreement constitutes an invalid contract of adhesion," Minnesota courts "examine the sophistication of the parties, the circumstances surrounding the execution of the agreement, and the burden arbitration places on the complaining party."  *Ottman v. Fadden*, 575 N.W.2d 593, 597 (Minn. Ct. App. 1998).  In light of the strong public policy favoring arbitration, "[m]ere inequality in bargaining power is an insufficient basis to invalidate an arbitration agreement."  *Id.*

Mr. Davis is not unsophisticated.  He is an independent contractor who has owned a series of semi-trailer tractor trucks.  He negotiated two contracts with Mohawk, and received the benefits of each.  Mr. Davis was not powerless to choose whether to lease his truck to Mohawk, and arbitration places no special burden on Mr. Davis.  The arbitration agreement in the 2004 ICOA is express in allocating arbitration fees, and ensures that Mr. Davis will not carry an unfair share of the costs.  Section 24(e) of the 2004 ICOA directs that Mr. Davis, as an owner-operator with a single commercial

vehicle, will pay as an arbitration filing fee the same amount that he would pay for a filing in this Court. It is Mohawk's burden to pay any remaining amount. *Id.*

Because Mr. Davis is not Mohawk's employee under the express terms of the 2004 ICOA, no exception applies and the FAA mandates arbitration. Even if he were construed to have been employed by Mohawk, the Missouri UAA would still mandate arbitration. All claims relating to the 2004 ICOA should be stayed or dismissed without prejudice, and these claims should be referred to arbitration in accordance with Section 24 of the 2004 ICOA.

### B. Mr. Davis's Claims Related to the 1998 ICLA are Time-Barred

The 1998 ICLA terminated in September 2004, and Mr. Davis served his Original Complaint in October 2006. Regardless of whether the claims in Mr. Davis's Amended Complaint relate back to that service date,[3] they are time-barred by the two-year statute of limitations provided by 49 U.S.C. § 14705(c). *See, e.g.*, *Fitzpatrick v. Morgan Southern, Inc.*, 261 F. Supp. 2d 978, 986 (W.D. Tenn. 2003).

---

[3] "An amendment to a pleading shall 'relate back' to the date of the original pleading only if the claim asserted in the original pleading and the claim asserted in the amended pleading arose out of the same conduct, transaction, or occurrence." *Mandacina v. United States*, 328 F.3d 995, 1000 (8th Cir. 2003) (construing Fed. R. Civ. P. 15(c)). The application of this doctrine lies in the discretion of this Court, and it is based on the rationale "that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Id.* New claims that are not "sufficiently similar in both 'time and type'" to the original pleading may not warrant a relation back. *See id.* at 1002. Although Mohawk suspects that the parties will disagree on this issue should its application be sought, it is not material for this motion, and its merits need not be reached at this time.

Mr. Davis likely will argue that the two-year period provided by § 14705(c) is inapplicable, and the Court should apply the general four-year limitations period provided by 28 U.S.C. § 1658(a). District courts, including those within this Circuit, are split on this issue. *Compare, e.g.*, *OOIDA v. United Van Lines, LLC,* 503 F. Supp. 2d 1200, 1205 (E.D. Mo. 2007) (*"OOIDA v. United Van* Lines") (applying two-year limitations period), *with OOIDA v. Ledar Transp.*, 2004 WL 5376211, at *5-6 (W.D. Mo. Jan. 7, 2004) (Ex. 11) (applying four-year limitations period). This dispute centers on whether § 14705(c) contains a "scrivener's error," and if so, whether courts should correct it. The decision in *OOIDA v. United Van Lines* is currently on appeal to the Eighth Circuit Court of Appeals, docket no. 07-3829. Oral argument was heard on June 9, 2008, and it is likely that the Court of Appeals will resolve this intra-Circuit split in the near future.

Nevertheless, the statute of limitation is two years. 49 U.S.C. § 14704(a)(1) provides for judicial actions to enforce administrative orders or to seek injunctive relief, while § 14704(a)(2) provides that transportation carriers and brokers are "liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." The Eighth Circuit in *OOIDA v. New Prime, Inc.*, 192 F.3d 778, 785 (8th Cir. 1999), interpreted these provisions as creating a private right of action for damages for truth in leasing violations.

49 U.S.C. § 14705 is entitled "Limitation on actions by and against carriers." Subsection (c) of this statute provides:

> (c) Damages — A person must file a complaint with the Board or Secretary, as applicable, to recover damages under section 14704(b) within 2 years after the claim accrues.

The applicability of this section to Mr. Davis's claims is complicated by the reference to § 14704(b).[4] That section provides for recovery of overcharges of tariff rates. This type of action, however, already had a limitations period, as 49 U.S.C. § 14705(b) directs that "[a] person must begin a civil action to recover overcharges within 18 months after the claim accrues." Thus, applying § 14705(c) to § 14704(b) would create two contradictory limitations periods – one for 18 months and another for two years – for the identical claim for overcharges, and none at all for damages. This was not Congress's intent. Rather, § 14705(c)'s two-year limitations period was intended to apply to damages claims, and Congress committed a simple scrivener's error in drafting this legislation.

**a.        The legislative history of Sections 14704 and 14705 demonstrates that there is a scrivener's error.**

Although the plain meaning of legislation usually should be conclusive, the Supreme Court has recognized that there are "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989). In a case like this, "the intention of the drafters, rather than the strict language, controls." *Id.*; *see also United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 444 (1993) ("Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.").

---

[4] While this section refers to actions before the Board or Secretary, it is well-accepted that this provision also applies to court actions. *See, e.g.*, *Engelhard Corp. v. Springfield Terminal Ry. Co.*, 193 F. Supp. 2d 385, 390 (D. Mass. 2002).

The *Fitzpatrick* court extensively analyzed the legislative history for the Interstate Commerce Commission Termination Act, and discovered that the damages section – now § 14704(a)(2) – originally had been designated as subsection "(b)(2)" while in draft form. In the process of finalizing the draft, the damages subsection had been shifted – but the correlating limitations provision was not updated to reflect this shift. *See Fitzpatrick*, 261 F. Supp. 2d at 982-83. As specifically set forth in *Fitzpatrick*,

- The 1995 Interstate Commerce Commission Termination Act, Pub.L. No. 104-88, 109 Stat. 803 (1995), furthered the deregulation of the rail and motor carrier industries, abolished the Interstate Commerce Commission, and bestowed certain enforcement and regulatory authority upon the newly created Surface Transportation Board. H.R. Rep. No. 311, 104th Cong., 1st Sess. 82-83 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793-94).

- Both the House of Representatives and Senate bills as originally drafted authorized a private cause of action under section § 14704(b)(2), which was subject to a two-year statute of limitations for actions pursuant to § 14705(c). H.R. 2539, 104th Cong. (1995); S. 1396, 104th Cong. (1995).

- The House of Representatives amended its version of § 14704 after debate on the floor. The record of the debate in the House of Representatives indicates that the proposed amendment to § 14704, in which § 14704(b)(2) became the current § 14704(a)(2), was included along with a larger group of changes known as the Whitfield Amendment, which mainly dealt with railroad mergers and railroad employees. 141 Cong. Rec. H. 12248, 1225312307 (Nov. 14, 1995). The amendment to § 14704 did not alter the text of the section, it merely moved one sentence to a new location.

- A Conference Committee met to discuss the differing House of Representatives and Senate bills and adopted the House of Representatives' version of § 14704. H.R. Conf. Rep. No. 104-422, at 221-222 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 906907.

The *Fitzpatrick* court found "the legislative history behind § 14704 indicative of a mistake for four reasons."  These included:

> **First**, in the Conference Report Congress specifically stated that it intended to preserve the relevant statute of limitations, which was two years under the former Interstate Commerce Act.  (citing H.R. Conf. Rep. No. 104-422, at 222 (1995), reprinted in 1995 U.S.C.C.A.N. 851, 907).

> **Second**, Congress specifically stated that it intended to make the limitations period uniform for all types of carriers.  The statute of limitations for the parallel provisions governing rail and pipeline carriers is two years.

> **Third**, the related statute of limitations provision in § 14705(c) was not concurrently amended to reflect the House of Representatives' amendment to § 14704.

> **Fourth**, testimony given during debate on the Whitfield Amendment in the House of Representative indicates that it was introduced in haste and that the Congressmen did not have sufficient time to review the bill and the proposed amendments.

*Fitzpatrick*, 261 F. Supp. 2d at 983 (emphasis added).  Taking all of this together, the court could "discern no logical reason why subsection (b)(2) became subsection (a)(2) without a concurrent amendment to the limitations provision in § 14705(c) which contained a reference to § 14704(b)(2)."  *Id.* at 985.  This "inadvertent mistake" should not be allowed to subvert Congress's intent, but rather the statute should be read as Congress intended.  *See id.*; *accord*, *OOIDA v. Mayflower Transit, Inc.*, 2006 WL 4552833, at *3 (S.D. Ind. Jul. 7, 2006) (Ex. 12) ("Applying § 14705(c) to suits brought under § 14704(a)(2) would avoid the absurdity that results from applying the statute as literally written.").

Several courts have rejected the *Fitzgerald* analysis, and have applied the generic, default four year statute of limitations.  *See, e.g.*, *OOIDA v. C.R. England, Inc.*, 325 F.

Supp. 2d at 1258; *Ruggles v. Bulkmatic Transport Co.*, 2004 WL 5376213, at *3-4 (S.D. Ohio June 23, 2004) (Ex. 13); *OOIDA v. Swift*, 2004 WL 5376210, at *6 n.5 (D. Ariz. July 28, 2004) (Ex. 14) (in *dictum*, rejecting *Fitzpatrick* analysis, and collecting cases).

However, even courts rejecting *Fitzpatrick* have applauded that court's analysis of the statute's legislative history. *See, e.g.*, *Smiley v. Smooth Operators, Inc.*, 2006 WL 1896357, at *4 (W.D. Wis. July 6, 2006) (Ex. 15) (observing that "defendant's summary of the legislative history discussed in *Fitzpatrick* is reasoned and persuasive"); *OOIDA v. Bulkmatic Transp. Co.*, 2004 WL 1151555, at *5 (N.D. Ill. May 3, 2004) (Ex. 16) ("Indeed, the *Fitzpatrick* court's treatment of this issue is facially thorough, reasoned, and compelling. Moreover, Congress' designation of specific statutes of limitations for some causes of action under section 14704 but not other is curious."). Nevertheless, these courts generally have held that, because the statute is not ambiguous without resort to the legislative history, nor are the results of a four-year limitations period necessarily "absurd," they are powerless to interpret the statute contrary to its plain, even if erroneous, language. *See, e.g.*, *id.* at *5.

**b.          The Surface Transportation Board agrees that the technical error should be corrected, and a two-year limitations period applies.**

The *Fitzpatrick* court's analysis is consistent with that of the Surface Transportation Board, the executive agency charged with interpreting and enforcing this statute and its implementing regulations. In *Government of the Territory of Guam v. Sea-Land Services, Inc.*, 2001 WL 1436500, at * 6 (S.T.B. Nov. 13, 2001) (Ex. 17), the Board

concluded that § 14705(c) contains a technical error, and that claims for damages are

barred if brought more than two years after they accrue:

> It is obvious that a technical mistake was made in executing amendments to
> H.R. 2539, which, after reconciliation with S. 1396, became the ICCTA.
> As reported by their respective committees, both the House and Senate bills
> placed the overcharges provision in section 14704(b)(1) and the damages
> provision in subsection (b)(2).  In both bills, section 14705(c) accurately
> referred to damages as described in section 14704(b)(2). *See* House Report
> at 62; 141 Cong. Rec. S17573 (daily ed. Nov. 28, 1995) (Senate bill).
> When certain amendments to the bill reported out by the House were
> executed, however, section 14704(b)(2) (making a carrier or broker liable
> for damages) was redesignated as section 14704(a)(2), and what had been
> section 14704(b)(1) (pertaining only to rate overcharges) was designated as
> section 14704(b), under the new title "LIABILITY AND DAMAGES FOR
> EXCEEDING TARIFF RATE."  This switching of subsection numbers was
> clearly not intended by the House to change well established limitations
> periods; indeed, in the House bill reported out, section 14705(c) continued
> to refer to section 14704(b)(2), a subsection that did not continue to exist
> under the House bill as inadvertently modified.  *See* 141 Cong. Rec.
> H12292.

*Id.* at *5.  The Board reasoned that it would be wrong to allow "an unintentional technical

error such as the one made here [to] override[] the obvious Congressional intent."  *Id.*;

*see also Nat'l Ass'n of Freight Transp. Consultants, Inc. — Petition for Declaratory

Order*, 61 Fed. Reg. 60140, 60141 n. 3 (S.T.B. Nov. 26, 1996) (Ex. 18) (noting in *dicta*

that there is "an apparent technical error in the statute").

The Surface Transportation Board's interpretation is entitled to consideration, and

at least some deference.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The

weight [accorded to an administrative] judgment in a particular case will depend upon the

thoroughness evident in its consideration, the validity of its reasoning, its consistency

with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control."); *see also United States v. Mead Corp.*, 533 U.S.
218, 228-29 (2001) ("The fair measure of deference to an agency administering its own
statute has been understood to vary with circumstances, and courts have looked to the
degree of the agency's care, its consistency, formality, and relative expertness, and to the
persuasiveness of the agency's position.") (footnotes omitted).  Here, the Board's opinion
is consistent with Congressional intent, and it should be adopted.

Sometimes it is necessary for the courts to clean up Congress's mess, and this is
such an occasion.  Ignoring the reality of Congressional intent is unwarranted where, as
here, that intent is clear.  Congress intended a two-year limitations period to apply to
claims like those brought by Mr. Davis, and his Truth-in-Leasing claims based on the
1998 ICLA are time-barred.

### C. Mr. Davis's Contract Breach Claim is a Restatement of His Statutory Claims and Should Be Dismissed

Mr. Davis's Original Complaint set forth a detailed allegation of breach, and in the
same passages alleged that he had acquiesced to Mohawk's alleged breach:

13. Sometime in 2003, while Plaintiff was reviewing an itemized statement, Plaintiff discovered a discrepancy between the amount of pay he received from the Defendant and the amount he was entitled to receive pursuant to the corresponding bills of lading and Rate Schedule.

14. Plaintiff brought the discrepancy to the attention of Mr. Gary Truttle [sic] and other managers of the Defendant, however, Plaintiff's concerns were quickly dismissed. . . .

17. For each pay period, Plaintiff discovered that Defendant had consistently withheld money from Plaintiff that was due him for services performed on Defendant's behalf. . . .

> 19. Thereafter, despite his knowledge of the pay discrepancy, Plaintiff continued to perform his obligations pursuant to the Agreement.

Original Complaint ¶¶ 13-19. Mohawk denied the allegations of breach, *see* Answer to Original Complaint ¶¶ 13-19. The parties exchanged discovery, and also corresponded in an effort to resolve the dispute in the Original Complaint, including efforts by Mohawk to explain, in detail, why the allegations of breach were simply wrong.

A review of Mr. Davis's First Amended Complaint reveals that it contains none of the detailed allegations of breach that were raised in his Original Complaint. The bulk of the First Amended Complaint is a restatement of the requirements of the Truth-in-Leasing regulations, and broad allegations that the 1998 ICLA and 2004 ICOA violate these regulatory provisions. Mr. Davis's allegations under "Count Two, Breach of Contract," consists of, first, a reallegation of these alleged regulatory violations, and:

> 39. Defendant has breached its lease with Plaintiff which incorporated the provisions specified in 49 C.F.R. § 376.12 as a matter of law.

> 40. As a result of the breach of the leases by Defendant, Plaintiff Kenneth Davis has incurred damages to be determined at trial, but which are in excess of $50,000.

Amended Complaint ¶¶ 39-40.

The allegations raised in Mr. Davis's Original Complaint, and not raised in his First Amended Complaint, have been abandoned, and are no longer any part of this case. *See Tolen v. Ashcroft*, 377 F.3d 879, 882 n.2 (8th Cir. 2004) ("It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect."); *Barnes v. United States*, 111 F. App'x 441, 443 (8th Cir. 2004) ("the district court did not err in finding that the Discovery Channel

Defendants had been dismissed from the suit by virtue of their absence from Barnes's Amended Complaint").

Mr. Davis's First Amended Complaint alleges that, by virtue of supposedly violating federal regulations, Mohawk committed a *per se* breach of the 1998 ICLA. *See* Amended Complaint ¶¶ 39-40. A party cannot convert an untimely statutory (or regulatory) violation into a timely breach of contract claim through the simple expedient of relabeling the cause of action. *See, e.g.*, *Betancourt v. W.D. Schock Corp.*, 907 F.2d 1251, 1255 (1st Cir. 1990) ("This plaintiff cannot escape the short 'hidden defect' limitation period [in the UCC warranty provision] simply by relabeling his action with the words 'breach of contract,' 'contractual deceit,' 'misrepresentation,' or the like.").

The mere recitation of the phrase "breach of contract" does not state a claim upon which relief may be granted. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007), the Court overturned the 50-year old "no set of facts" standard for dismissal and held that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true." A complaint must "nudge" those "claims across the line from conceivable to plausible." *Id.* at 1974. Mr. Davis's First Amended Complaint does not allege that Mohawk failed to take any action that it had pledged to take in the 1998 ICLA, or that it took some action forbidden by the 1998 ICLA. In these circumstances, Mr. Davis's allegation of breach is meaningless, and his claim must be dismissed under Rule 12(b)(6).

## CONCLUSION

For all the foregoing reasons, Defendant Larson Moving and Storage, Co. d/b/a Mohawk Moving & Storage asks this Court to dismiss all claims in Plaintiff Ken Davis's First Amended Complaint.  Claims related to the 1998 ICLA should be dismissed with prejudice as time-barred, and claims related to the 2004 ICOA should be dismissed without prejudice, or in the alternative stayed and referred to arbitration.  Moreover, Mr. Davis's alleged breach of contract claim fails to allege any breach of contract, and instead is a mere restatement of his regulatory claim.  This purported claim of breach should also be dismissed with prejudice as derivative of the time-barred claims, and in the alternative be dismissed with prejudice for failure to state a claim under Rule 12(b)(6).

Dated: June 25, 2008

FULBRIGHT & JAWORSKI, L.L.P.

s/ Patrick R. Martin
Patrick R. Martin (#259445)
Andre Hanson (#0258234)
2100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612)321-2800
Fax: (612)321-2288

***Attorneys for Defendant Larson Moving and Storage, Co. d/b/a Mohawk Moving & Storage***